**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
NASSAU & SUFFOLK COUNTY TAXI
OWNERS ASSOCIATION, INC., LINDY'S
FLEET SERVICE, INC., EOLA
MANAGEMENT, CORP. d/b/a ALL ISLAND
TRANSPORTATION OF MINEOLA,
DAVID BROS., INC. d/b/a DAVID
ENTERPRISES, NORTH SHORE
TRANSPORTATION SERVICES, INC., LI
YELLOW TRANSPORTATION, INC., and
COLONIAL TRANSPORTATION OF L.I., INC.,

       Plaintiffs,

   -against-

STATE OF NEW YORK, ANDREW M.
CUOMO, Individually and in his Official Capacity
as Governor of the State of New York, and
THERESA L. EGAN, Individually and in her
Official Capacity as Executive Deputy
Commissioner of the New York State Department
of Motor Vehicles,

       Defendants.
------------------------------------------------------------X

          <u>MEMORANDUM AND ORDER</u>

          CV 17-3839 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.**  <u>P</u><u>RELIMINARY</u> <u>S</u><u>TATEMENT</u>

   The Nassau and Suffolk County Taxi Owners Association, Inc. ("NSTOA"), along with

its members, licensed taxicab companies Lindy's Fleet Service, Inc., EOLA Management, Corp.,

d/b/a All Island Transportation of Mineola, David Bros., Inc., d/b/a David Enterprises, North

Shore Transportation Services, Inc., and Colonial Transportation of Long Island, Inc.,

(collectively, "Plaintiffs") bring this action against the State of New York, Governor Andrew

Cuomo, and Commissioner of the New York State Department of Motor Vehicles Theresa Egan

(collectively, "Defendants").  Plaintiffs challenge the constitutionality of recently enacted legislation authorizing the Department of Motor Vehicles ("DMV") to license and regulate transportation network companies ("TNC") such as Lyft and Uber.  Plaintiffs allege that New York's legislative scheme "has created a two-tiered system that violates Plaintiffs' rights to Equal Protection without a rational basis for such distinction" by creating an "arbitrary distinction between TNCs and other for-hire vehicles."  Plaintiff's Amended Complaint ("Am. Compl.") [DE 38] ¶ 5.

Presently before the Court[1] is Defendants' motion to dismiss Plaintiffs' Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7).  *See generally* Defendants' Memorandum in Support of their Motion to Dismiss ("Defs.' Mem.") [DE 48-2]; Defendants' Reply Memorandum ("Defs.' Reply") [DE 48-1].  Plaintiffs oppose the motion on a variety of grounds.  *See generally* Plaintiffs' Memorandum in Opposition ("Pls.' Opp'n.") [DE 46].  For the reasons set forth below, Defendants' motion to dismiss the Amended Complaint is GRANTED.

## II.    BACKGROUND

### A.    Factual Background

The Court takes the following facts from Plaintiffs' Amended Complaint and the documents attached to it, and accepts Plaintiffs' well-pleaded factual allegations as true for purposes of the instant motion.  *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013).  However, the Court does not credit or consider conclusory assertions or

---

[1]    The parties have consented to this Court's jurisdiction for all purposes, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  *See* DE 51.

formulaic recitations of the legal elements of a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court notes that Plaintiffs have attached as an exhibit to their Amended Complaint the text of the statutory provision at issue in this case, Article 44-B of the New York Vehicle and Traffic Law ("Article 44-B").  *See generally* Am. Compl, Ex. 1.  Although not explicitly incorporated into the body of the Amended Complaint, the Court may properly consider the text of Article 44-B and the Session Laws enacting it -- neither of which is disputed -- as attachments to Plaintiffs' pleading and as matters of legislative record.  *Romero v. Bestcare Inc.*, No. 15-CV-7397, 2017 WL 1180518, at *3 (E.D.N.Y. Mar. 29, 2017) ("On a motion to dismiss, the court may consider documents attached to the complaint, documents incorporated into the complaint by reference and facts of which the court may take judicial notice.") (citing *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech. Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014)); *Oneida Indian Nation v. New York,* 691 F.2d 1070, 1086 (2d Cir. 1982) (holding that on a Rule 12 motion, judicial notice of "law, legislative facts, or factual matters that are incontrovertible" is appropriate).

### 1.    *Article 44-B of the Vehicle and Traffic Law*

On April 10, 2017, Governor Cuomo signed into law Assembly Bill 3009C/Senate Bill 2009C as Chapter 59 of the Laws of 2017, which implemented parts of the 2017-18 New York State budget.  Am. Compl. ¶ 1.  Part AAA of Chapter 59 created a new Article 44-B of the New York Vehicle and Traffic Law ("VTL") regulating TNC services, which include ride-sharing services provided by companies like Uber and Lyft.  *Id.*; *see* 2017 N.Y. Sess. Laws 94.  In the words of the legislature, Article 44-B is intended "to ensure the safety, reliability, and cost-effectiveness of transportation network company (TNC) services within the state of New York

and to preserve and enhance access to these important transportation options for residents and visitors to the state." N.Y. Sess. Laws 93-94. To accomplish this, Article 44-B creates a state-wide TNC licensing scheme administered by the DMV. *See* N.Y. VEH. & TRAF. LAW § 1692(2)(a). The legislation also establishes requirements for TNCs relating to insurance, *id.* §§ 1692(2)(a), 1693, 1695, how fares are communicated and charged, *id.* §§ 1692(4)-(8), driver and vehicle eligibility, *id.* §§ 1696, 1699, and maintenance of records, *id.* §§ 1697, 1698, among other things.

Article 44-B defines a "TNC vehicle" as a vehicle

> (a) used by a transportation network company driver to provide a TNC prearranged trip originating within the state of New York; and

> (b) owned, leased or otherwise authorized for use by the transportation network company driver;

> (c) such term shall not include:

> (i) a taxicab, as defined in section one hundred forty-eight-a of this chapter and section 19-502 of the administrative code of the city of New York, or as otherwise defined in local law;

> (ii) a livery vehicle, as defined in section one hundred twenty-one-e of this chapter, or as otherwise defined in local law;

> (iii) a black car, limousine, or luxury limousine, as defined in section 19-502 of the administrative code of the city of New York, or as otherwise defined in local law;

> (iv) a for-hire vehicle, as defined in section 19-502 of the administrative code of the city of New York, or as otherwise defined in local law;

> (v) a bus, as defined in section one hundred four of this chapter;

> (vi) any motor vehicle weighing more than six thousand five hundred pounds unloaded;

> (vii) any motor vehicle having a seating capacity of more than seven passengers; and

> (viii) any motor vehicle subject to section three hundred seventy of this chapter.

N.Y. VEH. & TRAF. LAW § 1691(1).  Article 44-B defines a "transportation network company," or "TNC," as

> a person, corporation, partnership, sole proprietorship, or other entity that is licensed pursuant to this article and is operating in New York state exclusively using a digital network to connect transportation network company passengers to transportation network company drivers who provide TNC prearranged trips.

*Id*. § 1691(3).  The same section of Article 44-B in turn defines a "TNC prearranged trip" as follows:

> (a) "TNC prearranged trip" or "trip" means the provision of transportation by a transportation network company driver to a passenger provided through the use of a TNC's digital network:
>
> (i) beginning when a transportation network company driver accepts a passenger's request for a trip through a digital network controlled by a transportation network company;
>
> (ii) continuing while the transportation network company driver transports the requesting passenger in a TNC vehicle; and
>
> (iii) ending when the last requesting passenger departs from the TNC vehicle.
>
> (b) The term "TNC prearranged trip" does not include transportation provided through any of the following:
>
> (i) shared expense carpool or vanpool arrangements, including those as defined in section one hundred fifty-eight-b of this chapter; and
>
> (ii) use of a taxicab, livery, luxury limousine, or other for-hire vehicle, as defined in this chapter, section 19-502 of the administrative code of the city of New York, or as otherwise defined in local law.

*Id*. § 1691(6).

5

2.      *Plaintiffs' Allegations*

Plaintiffs contend that Article 44-B imposes a less onerous regulatory burden on TNCs

than the regulatory burden labored under by Plaintiffs and others in the taxi industry, and that

this disparity constitutes a violation of Plaintiffs' equal protection rights.  *See generally* Am.

Compl. ¶¶ 9-42.  As the Amended Complaint avers,

> Plaintiffs and other similarly situated local Nassau and Suffolk for-
> hire transportation companies will still be subject to the extensive
> costs and time consuming licensing procedures set forth in the
> plethora of regulations required in order to provide the exact same
> services to passengers.  By imposing more onerous burdens on the
> taxi industry, as compared to TNCs, this Law is in violation of the
> Equal Protection Clause of the Constitution as both businesses
> engage in the same business model – for-hire transportation and as
> such the same are similarly situated.

*Id*. ¶ 9.  As to the purported similarities between TNC services and the for-hire services provided

by Plaintiffs, the Amended Complaint asserts that the "for-hire transportation services provided

by Plaintiffs are pre-arranged, and regulated through the dispatching of [ ] vehicles.  Riders

request transportation services, are quoted a fee, and a vehicle is dispatched . . . . This is

precisely the same manner services are offered by the TNCs, however, one ride is ordered by a

voice call . . . and the other by utilizing [an] App."  *Id*. ¶ 12.

The majority of Plaintiffs' Amended Complaint is focused on highlighting the disparities

in the legal requirements applied to TNCs under Article 44-B vis-à-vis the legal requirements to

which Plaintiffs and other taxicab companies must adhere.  A brief summary of the areas of

regulatory disparity as asserted by Plaintiffs is appropriate here.  Plaintiffs allege that "Article

44-B now provides for more lenient safety standards for TNCs than taxicab companies."  Am.

Compl. ¶ 13.  Specifically, Plaintiffs state that registration of a vehicle with the Nassau County

Taxi and Limousine Commission requires drivers to undergo a state approved, fingerprint-based

background check, drug test, and DMV certified defensive driving course.  *Id*. ¶ 14.  Similarly, vehicle owners must submit to an independent background check, fingerprints, and a DMV license check.  *Id*.  By contrast, Article 44-B permits TNCs to conduct their own criminal background checks and issue their own TNC permits stating that applicants are not disqualified to drive under the law.  *Id*. ¶¶ 15, 17.  Plaintiffs state that TNCs are also permitted "to hire drivers who have been convicted of heinous crimes, provided that such conviction occurred more than seven years earlier."  *Id*. ¶ 16.  And although requiring maintenance of a "zero-tolerance" policy regarding alcohol and drug use, Plaintiffs state that Article 44-B "does not mandate drug testing of any kind for TNC drivers."  *Id*. ¶ 18.

Plaintiffs also point out the myriad local laws with which they and other traditional taxi companies must comply.  "In Suffolk County, there are regulations requiring taxi operators to register with all local Town and County municipalities . . . . Each of these jurisdictions provides specific laws with costs and expenses of licensing that range in cost but average between $150.00 – $300.00 per year, per vehicle, with similar costs per driver."  Am. Compl. ¶ 21. Additionally, "in Suffolk County some for-hire transportation companies and drivers are required to register with the Suffolk County Taxi and Limousine Commission (SCTLC)."  *Id*. ¶ 22.  In addition to an annual registration cost of $300.00 per year and proof of compliance with other requirements, the SCTLC requires that vehicle owners be of "good character and financially responsible."  *Id*.  Plaintiffs state that "[w]ith the enactment of the 44-B [*sic*] of the VTL, all vehicles operated by a TNC are exempt from all of these requirements."  *Id*. ¶ 23.  Local municipalities also "often require taxi operators to invest in and operate only cars that are no more than a certain number of years old, with certain equipment, or with certain mileage and are subject to regular inspections," while "[t]he State allows TNCs to deploy private drivers in their

7

own personal cars of any age or condition provided that they pass New York State safety and Emission Standards." *Id.* ¶ 36.

Plaintiffs also underscore the disparity in insurance requirements between Article 44-B and the laws applicable to traditional taxi operators. Each local municipality requires Plaintiffs "to maintain a certain level of automobile insurance on its vehicles which will cover the driver, passengers, pedestrians and any other third party in the event of an accident. The cost of this insurance in Nassau and Suffolk County can average between $6,000.00 – $7,000.00 per year, per vehicle." Am. Compl. ¶ 25. By contrast, "Article 44-B now permits a brand new and unique custom-made insurance requirement for TNCs designed to save them money. In essence, the law requires the TNC to obtain a 'blanket policy' which only covers the drivers when they are logged on to the TNC's app." *Id.* ¶ 26. This "hybrid insurance coverage is custom made for the large TNCs and impermissible and unavailable to taxicab companies at large. . . . This disparity in insurance expenses results in lost profits to the Plaintiffs." *Id.* ¶ 27. Adding to this disparity, Plaintiffs assert, is the fact that Article 44-B permits drivers to be only 19 years old, while "Plaintiffs and other taxicab companies are forced to obtain coverage under standard [insurance] policies which require drivers to be age twenty-five (25) or over. Once again, these restrictions unfairly limit the driver pool for the taxicab companies." *Id.* ¶ 28.

The result of the regulatory disparities between the laws applicable to taxi operators and Article 44-B is, according to Plaintiffs, a significant and unfair competitive advantage for TNCs:

> There are numerous disparities in treatment of taxi companies and TNCs. The fact is that each of these separate requirements have an economic impact on the company and drivers which affect the fares they are required to charge their riders. Such arbitrary favoritism damages the Plaintiffs by reducing their revenues. It also seriously handicaps their ability to compete fairly against the TNC [ ] companies to recruit drivers, which threatens to destroy their business entirely.

Am. Compl. ¶ 37.

**B.    Relevant Procedural History**

Plaintiffs commenced this action on June 27, 2017.  The initial complaint named the State

of New York as the sole Defendant and asserted a single claim for violation of Plaintiffs' equal

protection rights.  *See generally* DE 1.  Plaintiffs' initial complaint also contained a request for a

preliminary injunction, enjoining enforcement of Article 44-B, *see* DE 1 ¶ 74, as well as an

application for a temporary restraining order.  *See* DE 2.  On June 30, 2017, Judge Wexler held a

show cause hearing after which he denied Plaintiffs' application for a temporary restraining

order.  *See* DE 9.  On July 21, 2017, after hearing argument on Plaintiffs' fully-briefed motion

for a preliminary injunction, Judge Wexler denied that motion and directed the parties to proceed

with discovery.  *See* DE 27.

On the same day, the State of New York filed a letter application for permission to move

to dismiss the complaint, *see* DE 28, which Plaintiffs opposed.  *See* DE 29.  Judge Wexler

waived his pre-motion conference requirement and authorized the State to move forward with

the motion to dismiss.  *See* Electronic Order dated August 15, 2017.  On October 31, 2017, prior

to the filing of the State's motion to dismiss, Plaintiffs filed a motion to amend their complaint.

*See* DE 37.  Judge Wexler found the motion moot since Plaintiffs were entitled to amend their

complaint as of right under Federal Rule of Civil Procedure 15(a)(1)(B).  He also found the

unfiled motion to dismiss moot in light of Plaintiffs' proposed amendment.  *See* Electronic Order

dated October 31, 2017.  Plaintiffs filed their Amended Complaint on November 3, 2017.  *See*

DE 38.

On December 6, 2017, the State of New York filed a letter request to move to dismiss

Plaintiffs' Amended Complaint.  *See* DE 42.  Plaintiffs did not file a response to the State's letter

request, and on December 20, 2017, Judge Wexler again waived his pre-motion conference requirement and authorized Defendants to move forward with their motion to dismiss the Amended Complaint.  *See* Electronic Order dated December 20, 2017.  Defendants filed the instant motion to dismiss with Plaintiffs' opposition on February 23, 2018.  *See* DE 46-48.

On March 29, 2018, the parties consented to the jurisdiction of this Court for all purposes, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  *See* DE 50. The Consent form was "so ordered" by Judge Azrack[2] on April 5, 2018.  *See* DE 51.  This Court subsequently stayed all discovery and held the pre-trial conference in abeyance pending a ruling on the instant motion to dismiss.  *See* Electronic Orders dated April 25, 2018, and June 8, 2018.

## III.  DISCUSSION

### A.    Preliminary Issues

#### 1.    *Supplemental Documents Filed with the Motion Papers*

Initially, the Court points out that both Plaintiffs and Defendants have submitted, in addition to memoranda of law, affirmations in support of their respective positions as well as exhibits attached to those affirmations which contain supplemental materials.  *See* DE 46-48.  As a general matter, where a party moves pursuant to Rule 12 and "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  FED. R. CIV. P. 12(d); *see Wrap-N-Pack, Inc. v. Eisenberg*, No. 04-cv-4887, 2007 WL 952069, at *5 (E.D.N.Y. Mar. 29, 2007).  Notwithstanding this general rule, and as noted above, a court deciding a Rule 12 motion may consider, in addition to the allegations in a plaintiff's complaint, "any written instrument attached to it as an exhibit, materials

---

[2]   This case was reassigned to District Judge Joan Azrack following Judge Wexler's death in March 2018.

incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *McLennon v. City of New York*, 171 F. Supp. 3d 69, 88 (E.D.N.Y. 2016) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)). A court may also consider matters of which judicial notice may be taken. *See Kalyanaram*, 742 F.3d at 44 n.1.

Upon review of the documents submitted with the parties' motion papers, the Court does not find conversion to a Rule 56 motion to be necessary. Plaintiffs submit the text of Article 44-B [DE 46-1], previously submitted affidavits in support of injunctive relief [DE 46-2 – 46-3], and the Amended Complaint [DE 47-1]. Defendants submit the DMV's Notice of Emergency Rulemaking [DE 48, Ex. A], the DMV's Assessment of Public Comment and Notice of Adoption of Proposed Rules [DE 48, Ex. B], the initial and Amended Complaint [DE 48, Ex. C], and an Order to Show Cause and Verified Petition filed in New York State Supreme Court[3] [DE 48, Ex. D]. Each of these documents is either annexed to the Amended Complaint, integral to it, or something of which the Court may properly take judicial notice. *See Romero*, 2017 WL 1180518, at *3; *Oneida Indian Nation*, 691 F.2d at 1086. Accordingly, all documents in the parties' filings are within the scope of consideration on Defendants' motion to dismiss.[4]

---

[3]  Defendants state that "[o]n August 8, 2017, Plaintiffs faxed a bare Order to Show Cause to the Office of the New York State Attorney General, purportedly once again seeking injunctive relief, but this time, in the New York State Supreme Court." Defs.' Mem. at 6 n.2. On August 9, 2017, Plaintiffs' request for injunctive relief was denied. *Id*. Defendants state that the New York State Supreme Court proceeding is still pending. *Id.*

[4]  The Court also notes that, with respect to the portion of Defendants' motion seeking dismissal pursuant to Federal Rule of Civil Procedure 12(b)(7), "[i]t is a generally accepted principle that the court is not limited to the pleadings on a Rule 12(b)(7) motion." *Am. Ins. Co. v. Kartheiser*, No. 17-CV-5545, 2018 WL 2388533, at *1 (S.D.N.Y. May 25, 2018).

### 2.    *Defining Plaintiffs' Claim*

Plaintiffs' Amended Complaint purports to assert two causes of action.  The first, titled "EQUAL PROTECTION (U.S. CONST., AMEND. XIV)," alleges that Article 44-B of the VTL violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Am. Compl. ¶¶ 60-79.  The Second, titled "(Violation of 42 U.S.C. § 1983)," simply quotes 42 U.S.C. § 1983 stating that "[b]y virtue of the foregoing, Defendants violated Plaintiffs [*sic*] rights under 42 U.S.C. § 1983."  *Id*. ¶ 82; *see id.* ¶¶ 80-85.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979).  As such, one cannot "violate" 42 U.S.C. § 1983, nor can one's "rights under 42 U.S.C. § 1983" be violated, as the statute confers no substantive rights.  Since Plaintiffs' two causes of action are essentially the two necessary halves -- one substantive, one procedural -- of a single constitutional claim, the Court construes Plaintiffs' Amended Complaint to raise one claim, brought pursuant to Section 1983, asserting that Article 44-B of the VTL violates Plaintiffs' rights to equal protection granted by the Fourteenth Amendment to the United States Constitution.

### 3.    *Bases for Defendants' Motion to Dismiss*

Having determined the contours of Plaintiffs' claim, the Court must next assess the bases for Defendants' motion.  This analysis is necessary because, although not elucidated in their

motion papers,[5] Defendants' motion is founded on several discrete grounds for which differing standards of review apply.

Defendants argue that Plaintiffs' Amended Complaint should be dismissed for six reasons:  (1) the Eleventh Amendment to the United States Constitution bars Plaintiffs' claim against the State of New York and the Individual Defendants in their official capacities; (2) Plaintiffs' equal protection claim fails as a matter of law; (3) any claim brought pursuant to Article IV of the United States Constitution fails as a matter of law; (4) the Individual Defendants are entitled to qualified immunity; (5) Plaintiffs have failed to join necessary parties; and (6) Plaintiff NSTOA lacks standing to bring the instant action.  *See generally* Defs.' Mem. While arguments (2), (3), and (4) are properly construed as requesting dismissal pursuant to Rule 12(b)(6) for failure to state a claim, the Court construes arguments (1) and (6) as requesting

---

[5]  Counsel for Defendants' affirmation states that the motion is being made pursuant to "FRCP Rule 12(b)" without identifying any specific subsection(s) of that Rule.  *See* Affirmation of Susan M. Connolly, Esq. ("Connolly Aff.") [DE 48] ¶ 1.  Similarly, Defendants' memorandum in support states the "Standard of Review for a 12(b) Motion to Dismiss the Complaint," again without identifying any subsection(s) of Rule 12(b).  *See* Defs.' Mem. at 7.

dismissal pursuant to Rule 12(b)(1)[6] for lack of subject matter jurisdiction, and argument (5) as requesting dismissal pursuant to Rule 12(b)(7)[7] for failure to join necessary parties.

Where, as here, a defendant moves for dismissal of a pleading under Rule 12(b)(1) as well as on other grounds, "the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F. 2d 674, 678 (2d Cir. 1990) (quoting 5 C. Wright and A. Miller, *Federal Practice and Procedure,* § 1350, p. 548 (1969)); *Thompson v. Ocwen Fin. Corp.*, No. 3:16-CV-01606, 2018 WL 513720, at *2 (D. Conn.  Jan. 23, 2018) (explaining that it is well established that "federal courts should ordinarily resolve any doubts about the existence of federal subject matter jurisdiction prior to considering the merits of a complaint") (citing *Rhulen*, 896 F. 2d at 678); *Calverton Hills Homeowners Assn., Inc. v. Nugent Bldg. Corp*., 17-CV-03916,

---

[6]    Although Defendants do not invoke Rule 12(b)(1) with respect to their first argument, "the Supreme Court has, on more than one occasion, described the Eleventh Amendment as a 'jurisdictional bar,' *Seminole Tribe v. Florida,* 517 U.S. at 73, 116 S.Ct. 1114; *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and has stated that 'the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III.'" *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) (quoting *Pennhurst State Sch. & Hosp.*, 465 U.S. at 98).

Similarly, Defendants do not invoke Rule 12(b)(1) with respect to their sixth argument. However, it is well settled that standing is a necessary component of the Court's subject matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.") (citation omitted).

[7]    Although Defendants do not invoke Rule 12(b)(7) with respect to their fifth argument, they aver that Plaintiffs have failed to comply with Federal Rule of Civil Procedure 19.  As such, the Court construes this part of their motion as arguing "failure to join a party under Rule 19," pursuant to Rule 12(b)(7).  *See* FED. R. CIV. P. 12(b)(7).

2017 WL 6598520, at *4 (E.D.N.Y. Dec. 26, 2017) (same).  The Court will therefore address

Defendants' arguments with respect to Eleventh Amendment immunity and standing first.

### B.   Dismissal Pursuant to Rule 12(b)(1)

#### 1.   Standard of Review

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v.*

*United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing FED. R. CIV. P. 12(b)(1)).  In making this

determination, "'courts must accept as true all material factual allegations in the complaint' and

'refrain from drawing from the pleadings inferences favorable to the party asserting

[jurisdiction].'" *Deadwiley v. New York State Office of Children & Family Servs.*, 97 F. Supp.

3d 110, 114 (E.D.N.Y. 2015) (quoting *Fox v. Commonw. Worldwide Chauffeured Transp. of NY,*

*LLC,* No. 08-CV-1686, 2009 WL 1813230, at *1 (E.D.N.Y. June 25, 2009)).

#### 2.   Eleventh Amendment Immunity

Defendants argue that "Plaintiffs' claim brought pursuant to 42 U.S.C. § 1983, which

seeks declaratory relief against the State and the individual defendants in their official capacities,

cannot succeed as a matter of law because it is barred by the Eleventh Amendment to the United

States Constitution."  Defs.' Mem. at 8.

##### a.   Legal Principles

The Eleventh Amendment to the United States Constitution provides as follows:

> The Judicial power of the United States shall not be construed to
> extend to any suit in law or equity, commenced or prosecuted
> against one of the United States by Citizens of another State, or by
> Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.  "The Eleventh Amendment bars federal courts from entertaining suits

brought by private parties against a state in its own name."  *Peterson v. Tomaselli*, 469 F. Supp.

15

2d 146, 157 (S.D.N.Y. 2007). "As a result, '[a] State is thus immune from suits in federal court

. . . and such immunity extends to officers acting on behalf of the State.'" *Deadwiley*, 97 F.

Supp. 3d at 115 (quoting *Winokur v. Office of Court Admin.,* 190 F. Supp. 2d 444, 448 (E.D.N.Y.

2002)).

There are three well-recognized exceptions to this rule. First, a state may waive its

Eleventh Amendment immunity defense and consent to suit. *Ahmed v. City Univ. of New York*,

No. 15-CV-7375, 2017 WL 1216534, at *3 (E.D.N.Y. Mar. 27, 2017); *Deadwiley*, 97 F. Supp.

3d at 115 (quoting *Winokur*, 190 F. Supp. 2d at 448); *Coll. Sav. Bank v. Fla. Prepaid*

*Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) ("[A] State may waive its sovereign

immunity by consenting to suit.") (citing *Clark v. Barnard,* 108 U.S. 436, 447-448 (1883)).

"Second, Congress may abrogate the sovereign immunity of the States by acting pursuant to a

grant of constitutional authority." *Deadwiley*, 97 F. Supp. 3d at 115 (quoting *Winokur*, 190 F.

Supp. 2d at 448); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000).

It is the third exception that is relevant to Defendants' motion. In addition to consent and

congressional abrogation, "under the *Ex parte Young* doctrine, the Eleventh Amendment does

not bar a 'suit against a state official when that suit seeks . . . prospective injunctive relief.'"[8]

---

[8] In *Ex parte Young*, the Supreme Court addressed the inherent tension between the promise of the Fourteenth Amendment and the Supremacy Clause on one hand, and the principles of sovereign immunity embodied in the Eleventh Amendment on the other. *See Perez v. Ledesma,* 401 U.S. 82, 106 (1971) (Brennan, J., concurring in part and dissenting in part) ("*Ex parte Young* was the culmination of efforts by this Court to harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution."). In *Young*, the Supreme Court created an exception to the general principle that sovereign immunity limits the grant of Article III judicial authority, allowing federal courts to entertain certain suits against state officials claiming ongoing violations of federal law, where the relief requested is limited to prospective relief rather than money damages. "The theory of *Young* was that an unconstitutional statute is void, and therefore does not impart to [the state official] any immunity from responsibility to the supreme authority of the United States." *Green v. Mansour*, 474 U.S. 64, 68 (1985). The Supreme Court's "decisions repeatedly have

*Winokur*, 190 F. Supp. 2d at 448 (quoting *Seminole Tribe of Florida*, 517 U.S. at 73); *see In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372 (2d Cir. 2005) ("[A]lthough [t]he people in their sovereign capacity may be immune from suit, it does not follow that [officers of the state] should share this aspect of sovereignty when they violate the laws of the people.") (internal quotation marks omitted).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)); *see Pennhurst State Sch. & Hosp.*, 465 U.S. at 102 ("[A] suit challenging the constitutionality of a state official's action is not one against the State."); *Connecticut v. Cahill*, 217 F.3d 93, 101 (2d Cir. 2000) ("[T]he *Young* cases reflect the principle that a State is the only real defendant-party in interest when damages are sought, although that State's officials alone may still be sued for prospective injunctive relief.").

In addition to Eleventh Amendment immunity principles and the doctrine of *Ex parte Young*, the instant analysis requires an awareness that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," such

---

emphasized that the *Young* doctrine rests on the need to promote the vindication of federal rights." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 105; *Green*, 474 U.S. at 68 ("[T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.").

that "[s]uits against state officials in their official capacity [ ] should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotations and citations omitted).

### b.    Application

Defendants argue that Plaintiffs' claim against the Individual Defendants in their official capacities is barred by the Eleventh Amendment because "[w]hen injunctive relief is sought, any state official sued in his official capacity is a superfluous party when the State itself is a named defendant.  Thus, the individual defendants cannot be sued here in their official capacities." Defs.' Mem. at 9.  The contention here is that Eleventh Amendment immunity bars official capacity suits against state officials just as it bars suits against states, since "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer*, 502 U.S. at 25.  However, "[t]he doctrine of *Ex parte Young* permits a suit to proceed in federal court 'against a state official in his or her official capacity, notwithstanding the Eleventh Amendment." *Kisembo v. NYS Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 520 (N.D.N.Y. 2018) (quoting *Brown v. New York*, 975 F. Supp. 2d 209, 222 (N.D.N.Y. 2013)); *Nolan v. Cuomo*, No. 11 CV 5827, 2013 WL 168674, at *8 (E.D.N.Y. Jan. 16, 2013) ("[A] plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law.") (quoting *State Emps. Bargaining Agent Coal. V. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007)).  Defendants do not address in any meaningful way why Plaintiffs' suit cannot proceed under *Ex parte Young*.  Although they recognize the existence of the exception, Defendants quickly disregard its efficacy, stating that it is inapplicable because "plaintiffs do not have a valid constitutional claim against defendants and therefore any request for injunctive

relief must fail." Defs.' Mem. at 9; *see* Defs.' Reply at 1 ("[*Ex parte Young*] hinges on whether a plaintiff has a valid constitutional claim against [ ] particular State officials.").

Defendants misapprehend the law. For purposes of determining whether *Ex parte Young* circumvents Eleventh Amendment immunity, the Court need not analyze the merits of a claim. Rather, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc.*, 535 U.S. at 645 (2002) (quoting *Coeur d'Alene Tribe of Idaho,* 521 U.S. at 296). Indeed, the Supreme Court has rejected the very argument Defendants raise here. As the Court explained in *Verizon Maryland, Inc.*:

> The Fourth Circuit suggested that Verizon's claim could not be brought under *Ex parte Young,* because the Commission's order was probably *not* inconsistent with federal law after all. 240 F.3d, at 295–297. . . . It may (or may not) be true that the FCC's since-vacated ruling does not support Verizon's claim; it may (or may not) also be true that state contract law, and not federal law as Verizon contends, applies to disputes regarding the interpretation of Verizon's agreement. But the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim. *See Coeur d'Alene, supra,* at 281, 117 S.Ct. 2028 ("An *allegation* of an ongoing violation of federal law . . . is ordinarily sufficient" (emphasis added)).

*Id*. at 646; *see Cecos Int'l, Inc. v. Jorling*, 706 F. Supp. 1006, 1025 (N.D.N.Y. 1989) ("In determining whether the *Ex parte Young* exception applies, the issue is not whether a plaintiff will ultimately prevail on his claim that state officials are acting in violation of federal law. Instead the focus is on whether the complaint is seeking to enjoin a state official from enforcing a state statute, which 'allegedly' violates federal law."), *aff'd*, 895 F.2d 66 (2d Cir. 1990). Plaintiffs have alleged an ongoing violation of federal law and are seeking prospective relief. Their claim against the Individual Defendants in their official capacities appears then to fit appropriately within the exception of *Ex parte Young*.

However, there is an additional factor which must be satisfied in order for Plaintiffs' claim against the Individual Defendants to circumvent Eleventh Amendment immunity: "th[e] exception under *Ex parte Young* only applies where the official sued has 'some connection with the enforcement of the [allegedly unconstitutional act].'"[9; 10] *Kuck v. Danaher*, 822 F. Supp. 2d 109, 141 (D. Conn. 2011) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). As the Court stated in *Young*, "[t]he fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Ex parte Young*, 209 U.S. at 157. That a government official must have a connection to the allegedly unconstitutional government act makes sense, for "[a]n injunction may issue only in circumstances where the state official has the authority to perform the required act." *Loren v. Levy,* No. 00 CIV. 7687, 2003 WL 1702004, at *11 (S.D.N.Y. Mar. 31, 2003) (citation and internal quotation marks omitted).

Defendant Commissioner Egan is the Executive Deputy Commissioner of the New York State Department of Motor Vehicles. Article 44-B of the VTL provides that "[a] TNC may not operate in the state of New York without first having obtained a license issued by the department

---

[9]  While a sufficiently close connection between a defendant and enforcement of a government act or policy under *Ex parte Young* is required, "personal involvement" is not. A defendant's "personal involvement" in an alleged constitutional deprivation is a prerequisite for a *damages* action under Section 1983. However, district courts in this Circuit have held "that the personal involvement requirement does *not* apply to bar actions . . . pursuant to § 1983 for injunctive relief against a state official." *Marinaccio v. Boardman*, No. 1:02 CV 00831, 2005 WL 928631, at *9 (N.D.N.Y. Apr. 19, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).

[10]  Defendants appear to recognize this factor. *See* Defs.' Reply at 1 ("It is simply not enough to name State officials and ask that the Court assume that because plaintiffs believe their constitutional rights are being infringed, that the named State officials are responsible.").

in a form and manner and with applicable fees as provided for by regulations promulgated by the commissioner." N.Y. VEH. & TRAF. LAW § 1692(2)(a). The DMV subsequently issued proposed regulations which were adopted and are currently in effect. *See* Connolly Aff., Ex. A-B; N.Y. COMP. CODES R. & REGS. tit. 15 § 80. Because Article 44-B's central licensing provision unequivocally delegates rulemaking authority to Commissioner Egan in her official capacity, and because she has in fact acted on her rulemaking authority by issuing regulations, the Court is satisfied that Commissioner Egan has a sufficient connection to the challenged law to be a defendant here under *Ex parte Young*. *See Conn. Ass'n of Health Care Facilities, Inc. v. Rell*, No. 10-CV-136, 2010 WL 2232693, at *5 (D. Conn. June 3, 2010) ("[A] particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty is needed for a state officer to be a proper defendant under *Ex parte Young*.") (quotations omitted), *aff'd sub nom. Conn. Ass'n of Healthcare Facilities, Inc. v. Rell*, 395 Fed. App'x 741 (2d Cir. 2010), and *aff'd sub nom. Conn. Ass'n of Health Care Facilities, Inc. v. Bremby*, 519 Fed. App'x 44 (2d Cir. 2013). Accordingly, Plaintiffs' claim against Commissioner Egan in her official capacity is not barred by the Eleventh Amendment.

Governor Cuomo, on the other hand, is not referenced in his capacity as Governor anywhere in the statute, and it does not appear that his office has any particular enforcement authority over TNCs under Article 44-B. Nor does Plaintiffs' Amended Complaint state how the Governor is connected to Article 44-B beyond having signed the legislation into law. *See* Am. Compl. ¶ 1. All Plaintiffs' opposition memorandum can offer is the argument that "ANDREW CUOMO . . . continue[s] to enforce and license TNC's [*sic*] in violation of federal law." Pls.' Opp'n. at 17. However, "courts in the Second Circuit have not extended the exception under *Ex parte Young* on the basis that a state official has a general duty to execute and enforce state

laws." *Kuck*, 822 F. Supp. 2d at 142 (citation omitted); *see Conn. Ass'n of Healthcare Facilities, Inc.*, 2010 WL 2232693, at \*5 ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law. Holding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend *Young* beyond what the Supreme Court has intended and held.") (quoting *Children's Healthcare is a Legal Duty v. Deters,* 92 F.3d 1412, 1416 (6th Cir. 1996)); *Neroni v. Zayas*, No. 3:13-CV-0127, 2014 WL 1311560, at \*8 (N.D.N.Y. Mar. 31, 2014) ("Plaintiff does not identify any statutory provision giving the Governor the power to enforce the [allegedly unconstitutional] Provisions, and the Governor's general constitutional duty to 'take care that the laws are faithfully executed' does not create a sufficiently close connection to enforcement."). Since Plaintiffs have not alleged a sufficient connection between Governor Cuomo and Article 44-B, and since no such connection is apparent from the law itself, the Court finds that the Governor is not a proper defendant under *Ex parte Young*. As such, Plaintiffs' claim for prospective injunctive relief against Governor Cuomo in his official capacity is barred by the Eleventh Amendment. That claim is dismissed accordingly.

Similarly barred is Plaintiffs' claim against the State of New York. *See Winokur*, 190 F. Supp. 2d at 450; *Peterson*, 469 F. Supp. 2d at 157. Although Plaintiffs' claim for prospective relief against Commissioner Egan in her official capacity is proper under *Ex parte Young* and circumvents New York's Eleventh Amendment immunity, a suit against the State itself is barred in the absence of waiver or congressional abrogation.[11] "This jurisdictional bar applies

---

[11]    The Supreme Court has observed the "well-recognized irony in *Ex parte Young*; unconstitutional conduct by a state officer may be 'state action' for purposes of the Fourteenth Amendment yet not attributable to the State for purposes of the Eleventh. Nevertheless, the rule

regardless of the nature of the relief sought." *Murawski v. New York State Bd. of Elections*, 285 F. Supp. 3d 691, 695 (S.D.N.Y. 2018) (citation omitted). Plaintiffs' claim against the State of New York is dismissed accordingly.

Lastly, Plaintiffs' claim against Governor Cuomo and Commissioner Egan in their individual capacities cannot proceed for two related reasons. First, since Plaintiffs are not seeking money damages but only prospective relief, a suit against the Individual Defendants in their individual or personal capacities is improper. That is to say, it is only Commissioner Egan in her *official* capacity who can afford Plaintiffs the relief they seek should the Court order it. *See Kuck*, 822 F. Supp. 2d at 143 ("Plaintiffs cannot obtain prospective injunctive relief from the Defendants sued in their individual capacities as such Defendants would not have the authority to provide such relief in their individual capacities."); *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985) ("A victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him.") (internal quotation marks and citations omitted). Moreover, "[u]nder Section 1983, liability can only be imposed against defendants in their individual capacities for 'personal involvement . . . in alleged constitutional deprivations.'" *Platt v. Inc. Vill. of Southampton*, 391 Fed. App'x 62, 65 (2d Cir. 2010) (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir. 2004)). While Commissioner Egan in her official capacity is "connected" to Aritlce 44-B for purposes of the *Ex parte Young* exception to Eleventh Amendment immunity, Plaintiffs do not allege that either

---

of *Ex parte Young* is one of the cornerstones of the Court's Eleventh Amendment jurisprudence." *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 685 (1982).

Governor Cuomo or Commissioner Egan were in any way personally involved in the creation or passage of Article 44-B. Therefore, Plaintiffs' Section 1983 claim against the Individual Defendants in their personal or individual capacities must be dismissed.

### 3. *Standing of NSTOA*

Defendants also argue that "NSTOA cannot succeed on the merits because it lacks standing to even bring the action." Defs.' Mem. at 21. According to the Defendants, an organization such as NSTOA "does not have standing to vindicate the rights of [its] members under Section 1983 unless it falls within the limited exception regarding an alleged violation of a First Amendment right to freely associate." *Id.* at 22. Because this action does not implicate the First Amendment right to free association, Defendants argue, NSTOA lacks standing. *Id.* Defendants also claim Plaintiffs have failed to allege that NSTOA performs independent functions which are sufficiently harmed by Article 44-B to establish standing in NSTOA's own right (as opposed to on behalf of its members) under Article III principles. *See* Defs.' Reply at 7-8.

### a. Legal Principles

"[A]n association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity." *N. Am. Olive Oil Ass'n v. D'Avoilio Inc.*, No. 16-CV-06986, 2017 WL 5054714, at *5 (E.D.N.Y. Nov. 2, 2017) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)), *on reconsideration in part sub nom. N. Am. Olive Oil Ass'n v. D'Avoilio Inc*, No. 16-CV-06986, 2018 WL 3973011 (E.D.N.Y. Aug. 20, 2018). "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt*, 432 U.S. at 343).

However, the Second Circuit has instructed that when an organization brings suit under Section 1983 for alleged constitutional violations, it must do so on its own behalf, rather than on behalf of its members.[12] *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) ("It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have 'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured.'") (quoting *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors,* 737 F.2d 155, 160 (2d Cir. 1984)). Nevertheless, "nothing prevents an organization from bringing a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing as enumerated [by the Supreme Court] in *Lujan*." *Nnebe*, 644 F.3d at 156.

The constitutional prerequisites for standing emanating from the case-or-controversy requirement of Article III of the United States Constitution are well known. As the Supreme Court stated in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992),

> the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.
>
> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized,

---

[12]   The Second Circuit has recognized a limited exception to the general rule that organizations may not bring Section 1983 claims on behalf of their members where the organization alleges a violation of the First Amendment right to freedom of association. *See Aguayo v. Richardson,* 473 F.2d 1090, 1099-1100 (2d Cir. 1973); *Lopez Torres v. N.Y. State Bd. of Elections,* 462 F.3d 161, 170 n.1 (2d Cir. 2006). That exception is not implicated here, as the Court explains below.

and (b) "actual or imminent, not conjectural' or hypothetical[.]" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560-61 (internal citations and quotations omitted); *see Nnebe*, 644 F.3d at 156 ("To establish Article III standing, 'a plaintiff must have suffered an "injury in fact" that is "distinct and palpable"; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision.'") (quoting *Lujan*, 504 U.S. at 560-61).

### b.    Application

On the issue of NSTOA's standing, Defendants have the stronger argument here. Defendants are correct that in this Circuit, an organization generally does not have standing to vindicate the constitutional rights of its members pursuant to Section 1983.  Moreover, because the instant action does not implicate the First Amendment right to freedom of association, NSTOA is not entitled to the limited exception to the bar on Section 1983 organizational standing that the Second Circuit has recognized when the right to freedom of association is in play.  *See Aguayo*, 473 F.2d at 1099-1100; *Lopez Torres*, 462 F.3d at 170 n.1.

Since it is unable to establish organizational standing, NSTOA would need to point to allegations sufficient to satisfy the well-developed principles of Article III standing on its own. The Court finds that NSTOA has not done so.  The extent of Plaintiffs' allegations with respect to NSTOA is that the organization "is an association of licensed taxicab owners that conduct business on Long Island, New York within both Nassau and Suffolk Counties.  The association was formed in 1997 and its members own and operate more than 1,000 taxicabs throughout Nassau and Suffolk Counties."  Am. Compl. ¶ 6; *see id.* ¶¶ 4, 47-48.  The Amended Complaint is

devoid of any allegations stating how NSTOA, apart from its members, will be harmed by Article 44-B.  Plaintiffs argue that "[t]he organizational purpose of the Association is to unite Nassau and Suffolk County taxi owners so that they can work together to keep the for-hire transportation industry strong . . . . Clearly, the passage of [Article 44-B] substantially impacts the organizational purpose of the association and the NSTOA and its members have a direct interest in the outcome of this litigation."  Pls.' Opp'n. at 19.  However, Plaintiffs' argument is unable to fill the void in their pleading with regard to *how* the organization's interests will be harmed by Article 44-B.

While the Second Circuit has "recognized that only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact,'"[13] *Nnebe*, 644 F.3d at 157 (quoting *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 905 (2d Cir. 1993)), Plaintiffs have failed to advance *any* allegations of the purported impairment suffered by NSTOA *because of* Article 44-B.  As a result, Plaintiffs have failed to establish the organization's standing, and the Court dismisses NSTOA from the action.

**C.**    **Dismissal Pursuant to Rule 12(b)(7)**

Defendants argue that Uber, Lyft, and individual TNC drivers "have actually been operating throughout Long Island and the State at large for months.  It is now unquestionable that these two entities have interests clearly affected by the outcome of this litigation."  Defs.' Mem. at 21.  Plaintiffs' failure to join Uber and Lyft in this litigation, according to Defendants,

---

[13]    In *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011), the Second Circuit found that a non-profit organization representing taxi drivers had standing to challenge a New York City policy where the policy would result only in "some perceptible opportunity cost" to the organization as a result of increased expenditures on counseling to its members.  No such allegations exist in Plaintiffs' Amended Complaint.  As Defendants observe, Plaintiffs fail to allege that NSTOA "perform[s] independent functions" which would be affected by Article 44-B "such that including [NSTOA] as a plaintiff is proper."  Defs.' Reply at 8.

requires dismissal of the Amended Complaint.  Plaintiffs in turn argue that failure to join

individual TNCs or their drivers has no effect on the ability of the existing parties to effectively

litigate the action.  *See* Pls.' Opp'n. at 13.  Plaintiffs also maintain that "[t]he argument put forth

by the Defendant[s] . . . that each and every TNC now operating in New York must be joined as

a necessary party to the instant action is baseless and impractical."  *Id*. at 15.

### 1.    *Standard of Review and Legal Principles*

Federal Rule of Civil Procedure 12(b)(7) "authorizes dismissal of a pleading for failure to

join a party under Rule 19 [of the Federal Rules of Civil Procedure]."  *Nw. Consultants, Inc. v.*

*Bloom*, No. 10 CV 5087, 2012 WL 1941878, at *6 (E.D.N.Y. May 22, 2012).  Therefore,

"[b]efore dismissing a complaint under Rule 12(b)(7), a district court must determine whether a

missing party is necessary within the meaning of Fed. R. Civ. P. 19."  *City of New York v.*

*Milhelm Attea & Bros.*, 550 F. Supp. 2d 332, 352 (E.D.N.Y. 2008) (quoting *Johnson v.*

*Smithsonian Inst.*, 189 F.3d 180, 188 (2d Cir. 1999)).

When evaluating a motion to dismiss brought under Rule 12(b)(7), the Court must engage

in a two-step inquiry under Rule 19.  *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920

F.2d 1121, 1123 (2d Cir. 1990); *see* Fed. R. Civ. P. 19.  First, the Court must determine if a party

is "required" to be joined in the litigation under Rule 19(a)(1).  That rule provides as follows:

> Required Party.  A person who is subject to service of process and
> whose joinder will not deprive the court of subject-matter
> jurisdiction must be joined as a party if: (A) in that person's absence
> the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action
> and is so situated that disposing of the action in the person's absence
> may:  (i) as a practical matter impair or impede the person's ability
> to protect the interest; or (ii) leave an existing party subject to a
> substantial risk of incurring double, multiple, or otherwise
> inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1).  Second, "[i]f a party is necessary, but joinder would divest the court of jurisdiction, the court must consider whether dismissal is warranted under Rule 19(b), that is, whether the suit can proceed 'in equity and good conscience' without the necessary party." *Milhelm Attea & Bros.*, 550 F. Supp. 2d at 353 (quoting FED. R. CIV. P. 19(b)).  Rule 19(b) in turn lists factors the Court must consider to determine whether an action should proceed in the absence of a necessary party.

### 2.    Application

As the Second Circuit has emphasized, "[a] party is necessary under Rule 19(a)(1) only if in that party's absence 'complete relief cannot be accorded *among those already parties.*'" *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006) (emphasis in original) (quoting FED. R. CIV. P. 19(a)(1)).  Defendants have not addressed how the absence of TNCs or TNC drivers prevents the Court from according "complete relief . . . among those already parties."  Since the Amended Complaint's single constitutional claim implicates the duties and responsibilities of the State of New York and its officials alone, the absence of TNCs and individual TNC drivers does not prevent the Court from granting complete relief among Plaintiffs and Defendants.  *See MacDermid, Inc. v. Raymond Selle & Cookson Grp. PLC*, 535 F. Supp. 2d 308, 312 (D. Conn. 2008) (finding a party was not necessary under Rule 19(a)(1)(A) where "[t]he two counts alleged against [the named defendant] implicate his obligations alone"). The Court concludes that individual TNCs such as Uber and Lyft and individual TNC drivers are not "required" parties under the standard set out in Rule 19(a)(1)(A).

Nor are TNCs or TNC drivers required parties under Rule 19(a)(1)(B).  "The second prong of the Rule 19(a) inquiry turns on whether the non-party's absence will impair or impede its ability to protect its interests."  *BNP Paribas v. Bank of New York Tr. Co., N.A.*, No. 11 CIV.

350, 2012 WL 13059498, at \*12 (S.D.N.Y. Mar. 28, 2012). Although Defendants' motion

papers are not clear on this point, the focus of their argument appears to seek dismissal under

Rule 19(a)(1)(B), because, according to Defendants, TNCs and TNC drivers have a substantial

interest in the outcome of the litigation -- and proceeding in their absence could bind them

"without an opportunity to be heard and protect their interests." Defs.' Mem. at 21. However,

and as Plaintiffs observe,

> [it] is not enough under Rule [19(a)(1)(B)] for a third party to have
> an interest, even a very strong interest, in the litigation. Nor is it
> enough for a third party to be adversely affected by the outcome of
> the litigation. Rather, necessary parties under Rule [19(A)(1)(B)] are
> only those parties whose ability to protect their interests would be
> impaired *because of* that party's absence from the litigation.

*MacDermid, Inc.*, 535 F. Supp. 2d at 312 (emphasis in original) (quoting *MasterCard Int'l Inc.*,

471 F.3d at 387). Any harm that individual TNCs or TNC drivers would suffer as a result of a

negative outcome in this litigation would not be caused by their absence from the litigation.

Rather, such harm would be caused by a finding that Article 44-B violated Plaintiffs' equal

protection rights. Accordingly, TNCs and TNC drivers are not parties required to be joined

under Rule 19(a)(1)(B).

Moreover, as the plain language of the provision indicates, to be a "required" party under

Rule 19(a)(1)(B), a party must "claim[ ] an interest relating to the subject of the action." FED. R.

CIV. P. 19(a)(1)(B); *see Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996)

(declining to find a non-party entity to be a "required party" under Rule 19(a)(1)(B) where the

party had not "claim[ed] an interest relating to the subject of the action," and further finding that

a named party's "attempt to assert on behalf of [the non-party] its supposed concern about the

dilution of [the non-party's] interest . . . falls outside the language of the rule") (internal

quotations omitted); *BNP Paribas*, 2012 WL 13059498, at \*12 (collecting cases). As far as the

Court can tell, no TNC or TNC driver has claimed an interest relating to the subject matter of this action.  Nor do Defendants point to any such claim.  These parties therefore cannot be considered "required" under Rule 19(a)(1)(B).

For these reasons, the Court concludes that TNCs and individual TNC drivers are not properly considered parties "required to be joined if feasible" in the instant litigation under Rule 19(a)(1).  Their absence from the litigation poses no problem of justiciability.  Consequently, the Court denies Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(7).

**D.     Dismissal Pursuant to Rule 12(b)(6)**

The remainder of the arguments put forward by Defendants can be characterized as requests for dismissal of Plaintiff's Amended Complaint under Rule 12(b)(6) for failure to state a claim.  Specifically, Defendants contend the following:  (1) Plaintiffs' equal protection claim fails as a matter of law; (2) any claim Plaintiff purports to raise under Article IV of the United States Constitution fails as a matter of law; and (3) the Individual Defendants are protected from suit by qualified immunity.  The Court will briefly address Defendants' arguments with respect to Article IV and qualified immunity before focusing the balance of its attention on the equal protection argument.

### 1.     *Standard of Review*

When addressing a motion to dismiss brought pursuant to Rule 12(b)(6), the Court must liberally construe the claims set forth in the complaint, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  *See Aegis Ins. Servs., Inc.*, 737 F.3d at 176; *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).  The plaintiff must satisfy "a flexible 'plausibility standard,'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which is

31

to say, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570; *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level'") (quoting *Twombly*, 550 U.S. at 555).

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). There the Court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. First, district courts are to "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see id.* at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555). Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft*, 556 U.S. at 679. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678 (citations omitted).

### 2.    *Article IV of the United States Constitution*

Defendants argue that "[i]n amending their Complaint, plaintiffs have added a cause of action based on an alleged violation of the Privileges and Immunities Clause.  See Amended Complaint, Second Cause of Action."  Defs.' Mem. at 17.  They continue, "plaintiffs evidence a fundamental lack of understanding of this cause of action.  While styled as a claim based on 42 U.S.C. § 1983, such a claim is correctly based upon the U. S. Constitution, Art. IV, § 2, Cl. 1." *Id*.  Because the Amended Complaint cannot support such a claim, Defendants argue "dismissal as a matter of law is required." *Id*.

While the Court agrees that nothing in the Amended Complaint can support a claim brought under Article IV, the Court does not construe the Amended Complaint to be raising any such claim.[14]  The several paragraphs comprising Plaintiffs' "Second Cause of Action" simply quote the language of Section 1983 and assert (incorrectly, as explained above) that Defendants have violated Plaintiffs' rights under Section 1983.  Since the Court is unable to determine on what basis Defendants construe Plaintiffs' Amended Complaint to raise a claim under Article IV of the United States Constitution, the Court denies Defendants' motion to dismiss as to this argument.

### 3.    *Qualified Immunity*

Defendants maintain that Governor Cuomo and Commissioner Egan are protected by qualified immunity, and all claims against them require dismissal for that reason.  *See* Defs.' Mem. at 18-20.  However, the Court need not engage in the typical qualified immunity analysis since the Court has already determined that Plaintiffs' suit cannot proceed against the Individual

---

[14]    Section 2 of Article IV provides that "[t]he citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."  U.S. CONST. art. IV, § 2, cl. 1.

Defendants in their personal or individual capacities.  It is settled law that "[q]ualified immunity shields [ ] defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief."  *Adler v. Pataki,* 185 F.3d 35, 48 (2d Cir. 1999)); *Sudler v. City of New York*, 689 F.3d 159, 177 (2d Cir. 2012).  In the absence of a claim for monetary damages against Governor Cuomo and Commissioner Egan in their individual or personal capacities, Defendants' argument with respect to qualified immunity is moot.

### 4.    *Equal Protection*

The heart of Defendants' motion directly challenges the assertion that Article 44-B violates Plaintiffs' equal protection rights.  Defendants argue that Plaintiffs cannot demonstrate the "extremely high degree of similarity" between traditional taxis and TNCs that litigants asserting equal protection claims in the absence of suspect classifications must demonstrate. Defs.' Mem. at 17.  According to the Defendants, the "important differences between TNCs and taxicabs justify the use of different regulatory schemes to regulate taxi and TNC services, especially in light of the clear rationality of the statute in addressing State objectives, and Plaintiffs' equal protection claim fails."  *Id.*  Plaintiffs respond by arguing that "[e]ven a cursory examination of the alleged differences between TNC's [*sic*] and traditional taxicabs demonstrate that these are not material differences that justify such disparate treatments of taxicabs and TNCs."  Pls.' Opp'n. at 19.

### a.    **Legal Principles**

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike.  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [courts] have long recognized

that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "Such a claim, often referred to as a 'class of one' equal protection claim, stems from the Equal Protection Clause's requirement that the government treat all similarly situated people alike." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018).

At the motion to dismiss stage, a "class-of-one" plaintiff "must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union*, 899 F.3d at 49 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  As to similarity, such a plaintiff must plausibly allege that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) (citing *Ruston v. Town Bd. for Skaneateles,* 610 F.3d 55, 60 (2d Cir. 2010)).  The Second Circuit has held "that a class-of-one claim requires a plaintiff to show an extremely high degree of similarity between itself and its comparators," *Feiner*, 694 F.3d at 222 (citing *Ruston*, 610 F.3d at 60), the functional equivalent of a showing that a plaintiff and its comparators are "*prima facie* identical." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).  "The existence of highly similar circumstances . . . provide[s] an inference that

the difference in treatment 'lack[s] any reasonable nexus with a legitimate governmental policy.'" *Progressive Credit Union*, 889 F.3d at 49 (quoting *Neilson*, 409 F.3d at 105).

Part and parcel of the "high degree of similarity" that a class-of-one plaintiff must plead is the well-established principle of rational basis review of legislative acts that fail to implicate suspect classifications or fundamental constitutional rights.  In areas of social and economic policy, "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal protection challenge if there is any conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see Progressive Credit Union*, 889 F.3d at 49 ("[R]ational basis review contemplates 'a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.'") (quoting *Beach Commc'ns*, 508 U.S. at 314-15).  "This standard of review is a paradigm of judicial restraint." *Beach Commc'ns*, 508 U.S. at 314.  In applying this standard, a defendant's motion to dismiss will be granted "[w]hen neither the complaint nor the non-moving party's opposition negate 'any reasonably conceivable state of facts that could provide a rational basis' for the challenged classification." *Melrose Credit Union v. City of New York*, 247 F. Supp. 3d 356, 367 (S.D.N.Y. 2017) (quoting *Immaculate Heart Cent. Sch. v. N.Y. State Pub. High Sch. Athletic Ass'n*, 797 F. Supp. 2d 204, 211 (N.D.N.Y. 2011)), *aff'd sub nom. Progressive Credit Union v. City of New York*, 889 F.3d 40 (2d Cir. 2018).

### b.    Application

Since Plaintiffs do not allege that Article 44-B implicates suspect classifications or fundamental constitutional rights, their equal protection claim must proceed as a class-of-one

claim.  As such, Plaintiffs must be able to allege that they and TNCs are "*prima facie* identical" in all relevant respects.  *Neilson*, 409 F.3d at 105.

Before addressing specific distinctions between taxi operators and TNCs, the Court draws attention to Plaintiffs' central contention, identified in the following propositions:  traditional taxis and TNCs are similarly situated because, although methods of requesting their services differ, "[t]he service provided by both TNCs and taxi cab operators is transportation."  Pls.' Opp'n. at 25.  Similarly, traditional taxis and TNCs "perform the same service of providing consumers with on-demand transportation for a price: a traditional taxi and an App-based taxi both transport passengers from one point to another for a fee."  Am. Compl. ¶ 38.  As a general matter, the Court agrees with Judge Gorton of the District of Massachusetts, who observed that "it is not self evident that traditional taxicab operators and TNCs are similarly situated in the context of Equal Protection.  Plaintiffs' contention that both involve 'driver, vehicle, passenger and payment' and therefore must be treated equally does little to support its assertion that the two are similarly situated."  *Boston Taxi Owners Ass'n, Inc. v. City of Boston*, 84 F. Supp. 3d 72, 81 (D. Mass. 2015).

With respect to specific and material distinctions between traditional taxicab companies and TNCs, Plaintiffs' own filings illustrate several.  For example, Plaintiffs' Amended Complaint states that

> [t]he for-hire transportation services provided by Plaintiffs are pre-arranged, and regulated through the dispatching of [ ] vehicles. Riders request transportation services, are quoted a fee, and a vehicle is dispatched to provide them a ride.  This is precisely the same manner services are offered by the TNCs, however, one ride is ordered by a voice call on a phone and the other by utilizing the App on the same mobile device or phone.  It is posited that this difference is insufficient to permit the TNCs to adhere to different and more lax standards of licensing, maintenance and most importantly, safety regulations.

Am. Compl. ¶ 12.  This paragraph alone identifies two fundamental differences between the operation of traditional taxi companies and TNCs:  taxis operate "through the dispatching of [ ] vehicles" while TNCs do not, and taxis are "ordered by a voice call on a phone" while TNCs are not.  *See id.* ¶ 10 ("The vast majority of owners in Plaintiff's association operate their business by providing rides to passengers who call them and request transportation services."); *see also* Affidavit of John Tomitz, attached as Exhibit 4 to Pls.' Opp'n. ("Tomitz Aff.") [DE 46-4] ¶¶ 1, 8 ("I am . . . a shareholder in numerous for-hire transportation companies, including the Plaintiff, LINDY'S FLEET SERVICE, INC . . . . Our passengers call for a ride[,] we provide them with the cost over the phone, and then dispatch a vehicle for their pick-up."); Pls.' Opp'n. at 19 (referencing "company dispatcher").  *Compare with* N.Y. Veh. & Traf. Law § 1691(3) (defining a TNC as an entity "*exclusively* using a digital network to connect transportation network company passengers to transportation network company drivers") (emphasis added).

The documents accompanying Plaintiffs' motion papers highlight several other material differences in the way traditional taxi companies and TNCs operate.  It is generally understood, and Plaintiffs' filings make clear, that taxis and other non-TNC for-hire vehicles are company owned.[15]  *See* Affidavit of Larry Blessinger, attached as Exhibit 3 to Pls.' Opp'n. ("Blessinger Aff.") [DE 46-3]  ¶¶ 3, 16 ("I am the President of [NSTOA] . . . . I am also a shareholder in numerous for-hire transportation companies . . . . I am also the owner of approximately 300 individual taxis."); Affidavit of Charles David, attached as Exhibit 2 to Pls.' Opp'n. ("David Aff.") [DE 46-2] ¶¶ 1, 3 ("I am the President of DAVID ENTERPRISES, INC. D/B/A DAVID

---

[15]  Plaintiffs state that a taxi "requires a large capital investment when purchased," Am. Compl. ¶ 41, further highlighting the distinction between company-owned vehicles used exclusively as taxis and driver-owned TNC vehicles.

BROS. TAXI . . . . David Enterprises has principal offices located at 51 Park Avenue, Bay Shore, New York.  My company has been servicing the Bay Shore area . . . for over forty (40) years.").  TNCs, on the other hand, are "owned, leased or otherwise authorized for use by the transportation network company driver."  N.Y. VEH. & TRAF. LAW § 1691(1)(b).

Similarly, at least some taxi companies maintain physical locations at cabstands and public locations for on-the-spot rides.  Affiant Charles David states that his company "has a written Lease Agreement with the MTA Long Island Railroad for the exclusive right to park and provide transportation to passengers at the Long Island Railroad."  David Aff. ¶ 4.  His company is also "the only authorized company to enter the private property of The Bay Shore Ferry for the purposes of the pick-up and drop off of [Fire Island] Ferry passengers."  *Id*. ¶ 5.  Plaintiffs' opposition memorandum recognizes this reality with respect to taxi companies:  "Defendants allege that taxicab companies 'stalk' passengers at the train station . . . . In fact, in order to park at a LIRR train station in Nassau and Suffolk County, the company must have a lease agreement won through an RFP process . . . ."  Pls.' Opp'n. at 25.  TNC drivers, by contrast, "have no discrete physical location to solicit or offer on-the-spot rides."  Defs.' Mem. at 15.  Nor could they solicit on-the-spot rides at locations where certain for-hire companies have exclusive rights to provide transportation.  *See* David. Aff. ¶ 4; Pls.' Opp'n. at 25.

Perhaps inadvertently, Plaintiffs also underscore at least one significant difference in the way taxis and TNCs charge their customers.  As affiant John Tomitz states, Plaintiff and "[t]raditional taxi operator" Lindy's Fleet Service, Inc. "do[es] not 'surge price' or pay for any traffic delays, as TNCs often do."  Tomitz Aff. ¶¶ 6, 8.

Having highlighted these distinctions,[16] the Court recognizes that the instant case differs in at least one way from many of the recently litigated cases challenging legislative responses to the rise of ride-sharing companies.  In many of these cases, courts have identified as a "core distinction" between taxis and for-hire vehicles like Uber and Lyft the former's effective monopoly on the ability to accept spontaneous "street hails."  *See Melrose Credit Union*, 247 F. Supp. 3d at 369 (collecting cases).  For these courts, this distinction was "more than sufficient justification for the challenged [ ] regulations."  *Id.* at 368.  The ability to solicit or accept street hails is not a factor in the instant case.  According to the Amended Complaint and the laws it cites, "[a]lmost all jurisdictions on Long Island prevent taxis from cruising for 'hailing' passengers."[17]  Am. Compl. ¶ 11.

The Court does not find that the absence of this distinction negates the several material distinctions the Court has identified.[18]  Rather, these distinctions indicate that Plaintiffs are unable to allege an extremely high degree of similarity between themselves and TNCs so as to be *prima facie* identical.  *See Prestopnik v. Whelan*, 249 Fed. App'x 210, 213 (2d Cir. 2007) (Summary Order) (dismissing equal protection claim because "[t]he circumstances of [the

---

[16]   The Court recognizes that Defendants point to several other purported distinctions. *See, e.g.*, Defs.' Mem. at 14-15.  However, the Court limits its analysis here to only those distinctions having support in the pleadings, documents referenced in the pleadings or incorporated into the pleadings, and documents, filings, and matters of which the Court may take judicial notice.

[17]   Although this is a statement of law which the Court need not credit, the Court takes judicial notice of the legal provisions referenced by Plaintiffs in the Amended Complaint.

[18]   By prohibiting TNCs from accepting "street hails," *see* N.Y. VEH. & TRAF. LAW § 1692(7), Article 44-B reinforces the central taxi-TNC distinction relevant in many jurisdictions.  That certain local jurisdictions also prohibit taxis from accepting street hails cannot be used to negate an otherwise rational attempt to create a state-wide regulatory scheme. Plaintiffs' grievances regarding this prohibition would be better directed at local legislatures in the jurisdictions in which the prohibition exists.

plaintiff] and those of the proposed comparator were not . . . *identical in all relevant respects*")
(emphasis added); *Kenmore Mercy Hosp. v. Daines*, No. 09-CV-162S, 2011 WL 4368564, at *5
(W.D.N.Y. Sept. 19, 2011) (noting that a single distinction "alone means that the [plaintiff and
comparator] are not *prima facie* identical").

Plaintiffs' failure to allege an extremely high degree of similarity between traditional
taxis and TNCs necessarily precludes them from alleging that there is no rational basis for
Article 44-B's treatment of TNCs vis-à-vis traditional taxis.  Although the burden is on Plaintiffs
to negate every conceivable basis for support of Article 44-B, *Progressive Credit Union*, 889
F.3d at 49, the Court can posit several reasons why the legislature would desire to uniformly
regulate TNCs in a way that may advantage them with respect to traditional taxi operators.
Indeed, one need only look to the reason given by the legislature itself:  "to preserve and enhance
access to" TNC services, services which provide "important transportation options for residents
and visitors to the state."  N.Y. Sess. Laws 93-94.  That the legislature would want to supplement
and expand transportation options, especially in traditionally underserved areas, is certainly
rationally related to and served by the licensing and regulatory regime established in Article
44-B.  In light of the distinctions between the operations and business models of traditional
taxicab operators and TNCs identified above -- how rides are ordered/procured, how fees are
charged, the relationship between an entity and its drivers/vehicles, and the relationship between
an entity and the surrounding community -- Article 44-B rationally serves to effect the
legislature's stated purpose.

As the Supreme Court has stated, "[t]he general rule is that legislation is presumed to be
valid and will be sustained if the classification drawn by the statute is rationally related to a
legitimate state interest.  When social or economic legislation is at issue, the Equal Protection

Clause allows the [legislature] wide latitude." *City of Cleburne,* 473 U.S. at 440 (citations omitted). That is, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). In the absence of plausible allegations that traditional taxicab companies are *prima facie* identical to TNCs, and given Plaintiffs' failure "to negative every conceivable basis which might support" Article 44-B's treatment of TNCs, *Progressive Credit Union*, 889 F.3d at 49, the Court is compelled to grant Defendants' motion to dismiss Plaintiffs' sole claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss and Plaintiffs' Amended Complaint is DISMISSED in its entirety. The Clerk's Office is directed to close this case.

**SO ORDERED**.

Dated: Central Islip, New York
        September 28, 2018

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge